## MILWAUKEE ELECTRIC RAILWAY & LIGHT CO. v. CITY OF MILWAUKEE.

## CENTRAL TRUST CO. OF NEW YORK v. SAME.

### (Circuit Court, E. D. Wisconsin. May 31, 1898.)

1. STREET RAILROADS—MUNICIPAL REGULATIONS.

An ordinance requiring a street railroad charging 5 cent fares to sell 6 tickets for 25 cents, or 25 tickets for $1, is unreasonable, when the road is only making yearly net earnings of 3.3 per cent. to 4.5 per cent. on its bona fide investment, and paying 5 per cent. interest on its bonds. in a city where the current rate of interest on first mortgage real-estate security is 6 per cent. Such an ordinance is void, under the fourteenth amendment, as depriving the company of its property without due process of law.

2. SAME—REASONABLENESS OF ORDINANCES.

The power of a municipality to regulate street-railroad fares is subject to the limitations (1) that there is reasonable need on the part of the public, considering the nature and extent of the service. of lower rates and better terms than those existing; (2) that the rates and terms fixed by the ordinance are not clearly unreasonable, in view of all the conditions.

Final hearing in two actions,—one wherein the street-railway company is complainant, and the other brought by the trustee for the bondholders,—each seeking a decree declaring null and void, in respect of the complainant, a purported ordinance of the defendant city entitled "An ordinance to regulate the rate of fare upon the street railways in the city of Milwaukee, and providing for the sale of packages of tickets thereon," approved June 11, 1896, and to perpetually enjoin its enforcement.

Miller, Noyes, Miller & Wahl, Winkler, Flanders, Smith, Bottum & Vilas, and W. J. Curtis, for complainant.

Howard Van Wyck, for defendant.

SEAMAN, District Judge. The main controversy in each of these actions is whether the ordinance of June 11, 1896, unreasonably fixes rates of fare which would deprive the complainant of its property without due process of law, and thus violates the fourteenth amendment to the constitution of the United States. A further question is raised by the bill filed on behalf of the bondholders, and is pressed by argument in support of both bills, whether the municipality had power to regulate rates beyond the provisions contained in the several franchises which are vested in the complainant street-car company, limiting only to a five-cent fare. Both contentions are of serious import, involving, on the one hand, consideration of the rights of the community in respect of a great public utility, and interference with acts of municipal control, which are presumptively inviolable; and, on the other hand, affecting the preservation of private rights of property, where investment has been made in a great undertaking of public nature, on the faith of existing and probable conditions, and where, by reason of its nature, there can be no withholding of operation by the company, even if unremunerative. Ames v. Railway Co., 64 Fed. 165, 177; Wright v. Railway Co., 95 Wis. 29, 36, 69 N. W. 791. Further investigation has confirmed the im-

87 F.—37

pressions stated at the hearing, that the constitutional question was so clearly presented by the pleadings and testimony, and was so distinctly of federal cognizance, that it should be first considered. Certain rules to interpret and apply the limitations of the constitution in this class of cases are well settled by decisions of the supreme court. If the state of facts shown by the evidence clearly establishes a case of impairment within these rules, it will be unnecessary to pass upon the complicated question of general power, as one of first instance, calling for the interpretation of various statutes and ordinances.

The ordinance under consideration provides that tickets shall be sold, good for one fare, including one transfer, "in packages of six for twenty-five cents, and twenty-five for the sum of one dollar," thus making a reduction of the regular five-cent rate to all who so purchase tickets. Assuming, therefore, without so deciding, that the general power to fix and regulate the terms and rates to be charged subsists in the municipality,—namely, that by delegation it became vested with and still retains the full extent of legislative power undoubtedly possessed by the state,—there can be no inquiry here as to the wisdom or good policy of exercising the power so delegated, that being a matter of municipal discretion, over which the courts have no right of supervision or review. Nor is it open to inquiry in this case whether there is a public demand or need for the enactment, or whether it is just and reasonable in all its provisions, except for the single purpose of ascertaining its infringement of rights which are guarantied to the complainant by the constitution.

Upon this record it must be taken as true that enforcement of the ordinance would operate to reduce materially the net revenues of the street-car company. There is effort on the part of the defendant to show that the probable increase of passengers through the method of commutation tickets would make up for the reduction in rate, but no reliable basis is furnished, and the argument is too speculative for acceptance; while on the part of the complainant the testimony is founded upon practical and varied experience, and clearly shows it to be improbable that any increase in travel would yield receipts, over and above the additional expense necessarily entailed, to offset the decrease in gross receipts appearing prima facie from the reduction in fares. The claims are that a loss of income would result of "somewhere between 10 and 15 per cent. of the gross earnings," and estimates are presented by several witnesses of a net loss ranging from $87,000 to $140,000 per annum. It is sufficient, for the present consideration, that the ordinance must be regarded as a measure which reduces the rates of fare materially, and consequently would impair materially the net revenue produced by the property, and no analysis of the testimony upon that point is necessary, nor is any attempt required to state, even approximately, the amount of loss.

The law which must govern, when the facts are determined, is concisely and pertinently stated in the opinion by Mr. Justice Harlan, speaking for the supreme court, in Smyth v. Ames, 18 Sup. Ct. 418, 426, as follows:

"In view of the adjudications, these principles must be regarded as settled: (1) A railroad corporation is a person, within the meaning of the fourteenth amendment, declaring that no state shall deprive any person of property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws. (2) A state enactment, or regulations made under the authority of a state enactment, establishing rates for the transportation of persons or property by railroad, that will not admit of the carrier earning such compensation as, under all the circumstances, is just to it and to the public, would deprive such carrier of its property without due process of law, and deny to it the equal protection of the laws, and would therefore be repugnant to the fourteenth amendment of the constitution of the United States. (3) While rates for the transportation of persons and property within the limits of a state are primarily for its determination, the question whether they are so unreasonably low as to deprive the carrier of its property without such compensation as the constitution secures, and therefore without due process of law, cannot be so conclusively determined by the legislature of the state, or by regulations adopted under its authority, that the matter may not become the subject of judicial inquiry."

And this opinion reviews the line of decisions upon the subject, and clearly approves the application of the same doctrine to legislative regulation of charges over toll roads, in Road Co. v. Sandford, 164 U. S. 578, 594, 17 Sup. Ct. 198. Therefore it must be regarded as established beyond question that the power to regulate the rates of fare, which is here assumed to rest in the municipality, is subject to these limitations: (1) That there is reasonable need on the part of the public, considering the nature and extent of the service, of lower rates and better terms than those existing; (2) that the rates and terms fixed by the ordinance are not clearly unreasonable, in view of all the conditions. Neither of these considerations is independent of the other, and, although the public interest is of the first importance, the test is not what is desirable upon the part of either, but what is reasonable in respect of the rights of both. As stated in Smyth v. Ames, supra: "What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of the public highways than the service rendered by it is reasonably worth." So, in Road Co. v. Sandford, supra, it is clearly held, in the same view of mutual consideration, that it is neither the right of the corporation to subject the public "to unreasonable rates in order simply that stockholders may earn dividends," nor of the public to have the use of the conveniences thus furnished except "upon payment of such tolls as, in view of the nature and value of the service rendered by the company, are reasonable," but that "each case must depend upon its special facts"; and the reasonableness of rates must be measured by all the conditions, including, of course, the reasonable cost of operation and of maintenance "in good condition for public use, and the amount which may have been really and necessarily invested in the enterprise."

The difficulties presented in this case do not, therefore, rest in any doubt as to the general principles which must be observed, nor in ascertaining the actual facts disclosed by the testimony as a whole, so far as material to this controversy. Although the testimony on the part of complainant makes a volume of 1,445 printed pages, and

that of the defendant 163 pages, the only substantial contentions of fact relate to items of expenditure and claims of credit by way of depreciation, presented on behalf of the complainant as entering into the showing of net revenue, and to the present or reproduction value of the plant. And it may be remarked, in passing, that this testimony is so well classified and indexed, with such fair summaries in the briefs, that the task of examination has been materially lightened. But the sole embarrassment in the inquiry arises from the wide divergence which appears between the actual and undisputed amount of the cash investment in the undertaking, and the estimates, on either hand, of the amounts for which the entire plant could now be reproduced, in the view that the line of authorities referred to does not attempt to define or specify an exact measure or state of valuation, and leaves it, within the principles stated, that "each case must depend upon its special facts." Therefore the twofold inquiries of reasonableness above indicated are of mixed law and fact, and start with the presumption, in favor of the ordinance, (1) that the prevailing rates exacted too much from the public, and (2) that those prescribed are reasonable.

1. Are the terms and rates fixed by the company excessive demands upon the public, in view of the service rendered? The Milwaukee Street-Railway Company, of which the complainant is the successor in interest, was organized in December, 1890, for the purpose of establishing an electric street-railway system, which should cover the entire field for the city of Milwaukee. There were then in operation five distinct lines, owned separately, operated mainly by horse or mule power, each charging separate fares, and having no system of transfers. It is conceded that the service was slow and antiquated, was not well arranged for the wants of the city, and was generally inadequate and unsatisfactory. As the old lines occupied the principal thoroughfares, and the public interest prevented the allowance of double lines in such streets, the improvement could not be made effective unless those lines were purchased, or in some manner brought into the proposed system. They were gradually acquired, at prices which may appear excessive when measured by results, and during the ensuing period of about three years the work of installing the new system was carried on, involving an entire reconstruction and rearrangement of the old lines and extensions, and new and improved equipments throughout, at an expenditure of over $3,000,000, aside from the cost of the old lines. As a result, at the time the ordinance was adopted, the mileage of tracks had increased from the previous aggregate of 110 miles to 142.89 miles, reaching every section of the city, with shorter and better routes, and furnishing 38 transfer points, with a universal transfer system,—a feature of special value to the public, as a single fare of five cents gives a maximum length of ride more than double the old arrangement. The service was improved in speed and regularity 50 per cent. or more, with better cars and less inconvenience, and it appears beyond question that it was generally more satisfactory and economical from the standpoint of the public. In other words, the service was materially enhanced in its value to the public, without any increase

in either normal or maximum charges, affording rides for five cents which had previously cost two and even three fares; and against all these advantages there appears only a single benefit extended by three out of the five constituent companies which is not given under the new arrangement, namely, in the sale of commutation tickets,—an omission for which there seems to be plausible excuse and offset in the universal system of transfers, aside from the other advantages. Surely, therefore, no imposition upon the public appears through any comparison between the old and the new service and rates. Nor does it find any countenance in comparison with either service or rates which prevail in other cities, for it is shown in this record, and is undisputed, that the five-cent rate is almost universal; that commutations are exceptional in cities of like class, and arise out of exceptional conditions, which are not fairly applicable here; and that instances of lower rates are so clearly exceptional that they cannot have force for any affirmative showing of reasonableness in the instant case. Nevertheless, with the burden of proof on the defendant, these considerations are not controlling, unless it further appears that the earnings of the company are insufficient, in view of the amount which may justly be regarded as the investment in the undertaking, to warrant the making of rates and terms which are more advantageous to the public. The interests of the public in its highways are paramount, and, if the service can reasonably be afforded more cheaply in Milwaukee than in other cities of like class, the community is entitled to the just benefit of any possible conditions which may tend to that result. The issue in that regard must be met under the second branch of inquiry, but I am clearly satisfied that this first question must be answered in favor of the complainant, if the evidence sustains its claim that lower rates would be confiscatory, and not compensatory.

2. Are the earnings of the property insufficient, in view of all the conditions, to justify this reduction in the rates of fare? Solution of this inquiry depends upon the showing (1) of earning capacity at existing rates, and (2) of the "amount really and necessarily invested in the enterprise," and upon the conclusion (3) whether the ratio of return upon the investment is excessive. In the statements which are referred to both parties have adopted a ratio, so far as necessary, to separate the electric lighting plant owned by the complainant, so that the statements which follow relate exclusively to the street-railway plant, except where otherwise mentioned.

First. The question of earning capacity is confined by the testimony to the results of three years' operation, being after the system was fairly installed, and inclusive of the year in which the ordinance was adopted, namely, 1894, 1895, and 1896. It is suggested on behalf of the defendant that those years were exceptional, for one cause and another, and are not a fair criterion for future earnings under more favorable circumstances; but the suggestion is without force in this case, because the ordinance operates upon these very conditions, and must, of course, be predicated upon them,—upon existing facts, and not upon mere future possibilities,—and, so determined, the instant case cannot affect rights under new conditions.

The proofs on the part of the complainant furnish, in detail, from the books of account, the gross earnings, the various items of expense and of charges for which deduction is claimed, excluding any payments of, or allowance for, interest on the bonded indebtedness, and state the net earnings as follows: In 1894, $64,868.77; in 1895, $269,202.30; in 1896, $100,628.81. In this showing it appears that deduction of $247,324.88 is made in 1894 for "depreciation," being the amount apportioned in that year to meet the alleged annual loss by physical depreciation of the plant, to keep the capital intact. No such deduction is made in 1895 and 1896, because not shown in the books, although it is insisted that like credit is due in each year, for the purposes of this case.

The defendant concedes the correctness of the showing as to the gross earnings, but disputes certain large items for which deductions are made in the above statement, corrects some items, and denies that any allowance should be made for depreciation. Aside from the fact that reports and statements of financial condition made from time to time by the company omit many of the deductions here asserted, these contentions on the part of the defendant rest solely upon the books of account kept by the company, and the testimony of Mr. De Grasse, stating his conclusions as an expert accountant from examination of such books, with the following result as to net earnings: In 1894, $387,074.70; in 1895, $479,621.11; in 1896, $66,520.99. But this total for 1896 erroneously includes an allowance of $160,550 paid for interest on bonds, which should be excluded on the basis assumed, and would make the net earnings for that year, on his computation, $227,070.99. In this statement the allowance for depreciation in 1894 is excluded by Mr. De Grasse, because that item was in fact charged off upon change in the system of bookkeeping. He also excludes large amounts of undoubted expenditures upon the hypothesis that they belong to "construction account," as covering permanent improvements, and not to "expense of maintenance," as stated; rejects certain payments as accruing on account of previous years, and certain sums apportioned and charged off to meet damage claims; and makes corrections as to taxes, for which the book entries were made in advance upon estimates by way of apportioning the expenses of the year, pending litigation and other causes. However valuable this testimony is for analysis of the bookkeeping methods and for correction of certain charges, it is clearly insufficient, without other support, to contradict the undisputed testimony, both positive and expert, on the part of complainant, which verifies substantially its contention upon the disputed subjects of deduction, namely, that the expenditures so charged were largely, if not wholly, of such nature as to justify deduction for "maintenance"; and that depreciation is a well-recognized fact in all such plants, for which allowance must be made to save the capital from impairment, without regard to any question of its entry upon the books.

Making allowances for maintenance alone, in accordance with the analysis presented by the expert witnesses Goodspeed, Coffin, McAdoo, and Beggs, taking in each instance the estimate most favorable to the defendant, I am satisfied that the defendant's claim of net earnings

must be materially reduced, and that the largest amounts which can be assumed upon its theory, excluding any allowance for depreciation (except that for 1894 the "maintenance" allowance is increased, to bring it—the general allowance—up to the minimum estimate by the experts), would approximate the following sums:

| | |
|---|---|
| In 1894 ...................................................... | $230,000 |
| In 1895 ...................................................... | 340,000 |
| In 1896 ...................................................... | 115,000 |
| | $685,000 |

—Making the average earnings per year, say, $228,333.

In reference to the element of depreciation, the witness Beggs gives the following explanation:

"I think experience has demonstrated that the utmost life that can be expected from the best roadbed that can be laid to-day would be, at the outside, ten to twelve years, when it would have to be almost entirely renewed. The Milwaukee Company is in that condition to-day, because of the different periods that their track went down, and due to the fact that it was not all put down at one time, and it must now of necessity commence to lay about 12 miles of track annually, being about one-twelfth of its total mileage; and will be required, whether they wish to or not. to lay that amount annually hereafter, and will thereby be keeping their tracks fairly up to the standard. The same applies, I might say, to the equipment. In my estimate I have calculated that the Milwaukee Company must do this year, which, as a matter of fact, it is doing, what it did last year,—in other words, put on not less than 20 of the most modern, best-constructed equipments, thereby keeping its standard up to the minimum it has now, of 240 equipments; because I think it is fair to assume that the average life of the double equipment, taken as a whole, will not exceed 12 years, the life of the motor being somewhat less than that, and that of the car we hope may exceed it possibly several years,—I mean the car bodies; but that, in the main, we hope that we will get an average life of twelve years out of them. So, taking 20 equipments annually, you would keep to your standard of 240 equipments, which is absolutely necessary to maintain—to operate—the Milwaukee Street Railway. I mean cars complete, with motors and complete electrical equipment."

For the causes thus stated, within general rules which are well known, it is manifest that this element must be taken into account before it can be determined that earnings derived from a plant are excessive; and in the same line there is much force in the argument of counsel that consideration should also be given to the factor of depreciation by amortization of franchises, as all the franchises in question terminate in the year 1921. The latter item, if allowed, would be a matter of simple computation; but a just measure of physical depreciation seems, to some extent, although only partially, involved in provisions for maintenance, and, while the testimony is very full and instructive upon this subject, it does not clear the case from serious difficulties in the way of stating a definite ratio or sum for such allowance. I am, however, clearly of opinion that neither of these elements is essential to the determination of the issues upon any aspect presented by the testimony, and that depreciation may be left to serve as an important factor of safety, in either view.

Second. As to valuation: For purposes of the company, the value of the property, including both railway and lighting plants, appears to have been placed at $14,250,000, represented by the issue of bonds

for $7,250,000; preferred stock, $3,500,000; and common stock, $3,-
500,000; but this aggregate was clearly excessive, after excluding the
electric lighting department, and on no view can it be taken as the
basis for the present consideration. The statements of the actual
cost of the constituent street-railway properties, including the cash
investment for improvements, are necessarily complicated, from the
fact that payments were partly made in stocks and bonds, and the
aggregate amount varies according to the ratio of valuation placed
upon the bonds alone,—in two statements in which the stock is ex-
cluded, and in one statement which values both stock and bonds,—
the minimum being $9,024,107.85, and the maximum $11,313,829.84.
The former amount was subsequently modified (page 465, Complain-
ant's Proof), making the statement of cost $8,885,644.17; and as this
excludes any valuation of stock, and places the value of the bonds at
the discount agreed upon between the parties, which also seems
fair, it may justly be taken as representing the true amount invest-
ed. But adoption of this purchase amount does not meet the issue,
as it is the value of the investment, and not the amount paid, which
must control. On the other hand, both parties introduce testimony
placing valuations upon the various items of the plant as it exists in
fact, upon the basis of its reproduction value. This amount, as
stated by the witnesses for complainant, aggregates $5,153,287.76;
while, on the face of defendant's proofs, the value of the tracks and
equipment is placed at $2,358,799; the real estate and buildings be-
ing valued separately, and the highest valuation of the real estate
being $236,949, and of the buildings $208,449, making the aggregate
$2,804,197. It appears, however, that these estimates on behalf of
the defendant omit 27 miles of track, many parcels of real estate, and
other items, so that counsel for defendant concedes that this aggre-
gate should be increased to $3,679,631. The wide difference in these
amounts is mainly due to divergence in the estimates upon tracks
and equipment. So the amounts on real estate and buildings, after
allowance for the omissions, would appear higher on the valuations
submitted by the defendant than those of the other side. For the
valuation of tracks and equipment, the defendant relies upon the es-
timate made by Mr. Partenheimer, a witness of apparent ability and
experience as a street-railway contractor, engaged in business at
Chicago; but his examination of the plant was cursory, being made
within three days, and could not give the detailed information upon
which a just estimate for this inquiry must be based, and it is con-
ceded that he left out of consideration many important items (aside
from the error in mileage) which should enter in and would greatly
increase the amount as estimated on his basis. Both upon its face and
by reference to other source of information, this estimate is far below
any fair valuation, for the purpose in view, either at the sum stated by
the witness, or with the additions conceded on behalf of the defendant;
the former amount being in fact $320,000 short of the actual cash ex-
penditures by the company for construction and equipment. Opposed
to this, the estimate for complainant is made by Mr. Clark, an expert
of distinction in this line, who gave weeks to the examination, with the
aid of a corps of assistants, and presents the results in detailed state-

ments, so that his testimony and estimates impress me as well found-
ed; and they are supplemented and supported by the testimony of
Mr. Coffin, Mr. Payne, and other witnesses, and by comparative show-
ing of mileage valuations in Massachusetts, which appear in the note-
worthy system of reports published by that state.   I am satisfied that
the property of complainant represents a value, based solely upon the
cost of reproduction, exceeding $5,000,000.   And I am further satis-
fied that this amount is not the true measure of the value of the
investment in the enterprise.   It leaves out of consideration any al-
lowance for necessary and reasonable investment in purchase of the
old lines and equipments, which were indispensable to the contem-
plated improvement, but of which a large part was of such nature
that it does not count in the final inventory.   No allowance enters
in for the large investment arising out of the then comparatively
new state of the art of electric railways for a large system, having
reference to electrical equipment, weight of rails, character of cars,
and the like, of which striking instance appears in the fact that the
electric motor which then cost about $2,500 can now be obtained for
$800; so that work of this class was in the experimental stage in
many respects, and the expenditures by the pioneer in the undertak-
ing may not fairly be gauged by the present cost of reproduction.
Of the $5,000,000 and over paid for the acquisition of the old lines,
it would be difficult, if not impossible, from the testimony, to arrive
at any fair approximation of the share or amount of tangible prop-
erty which enters into the valuation in this inventory.   It does ap-
pear that the roadways required reconstruction with new rails and
paving, and that the amount stated was actually paid by the in-
vestors, making their investment nearly $9,000,000.   How much of
this may be defined or apportioned as the amount which was both
"really and necessarily invested in the enterprise" (vide Road Co. v.
Sandford, supra) I have not attempted to ascertain, except to this
extent: that I am clearly of opinion that at least $2,000,000 of those
preliminary expenditures are entitled to equitable consideration, as
so invested, beyond the reproduction value, if the valuation of the
investment is not otherwise found sufficient for all the purposes of
this case, but no opinion is expressed in reference to the remaining
$1.885,644.

Third. The final inquiry, whether the net earnings shown are in
excess of or equal to a just return upon the investment, presents no
serious difficulty. under the premises above stated.   Assuming $5,-
000.000 as the basis of investment, the ratio of earnings would be as
follows:   (1) At the extreme computations of defendant, the yearly
average would be $364,000, which would yield .072 per cent.; (2) at
the complainant's figures, after adding the corrections for taxes, the
return would be .033 per cent.; (3) at the amounts which are above
stated as my deductions from the testimony, the yearly average, being
$228,333, would make .045 per cent.   Assuming $7,000,000 as the
basis, the ratio of earnings would be, upon each of said versions, as
follows:   For the first, .052 per cent.; for the second, .023 per cent.;
for the third, .032 per cent.

The interest rate fixed in the bonds issued by the company is 5 per

cent. The rate which prevails in this market, as shown by the uncontroverted testimony, is 6 per cent. for real-estate mortgages and like securities. If the $5,000,000 basis be adopted, surely a better rate must be afforded for the risks of investment than can be obtained on securities of this class, in which there is no risk. Upon the basis of $7,000,000, which is more logical and just, the 5 per cent. named in the bonds is clearly not excessive, and should be accepted by a court of equity as the minimum of allowance; and, even upon the defendant's partial showing, the return would be less than one-quarter per cent. above that, with the large margin for depreciation left out of account.

I am of opinion that the testimony is not only convincing in support of the material allegations of the bill, but is uncontradicted and conclusive that the improved service received by the public, with the universal system of transfers, is well worth the five-cent rate charged therefor; that the company has not received earnings in excess of an equitable allowance to the investors for the means necessarily invested in furnishing such service; that enforcement of the ordinance would deprive complainant of property rights, by preventing reasonable compensation for its service; and that, therefore, the ordinance clearly violates the constitution of the United States, and is invalid. Decree must enter accordingly, and for an injunction as prayed in the bill.