THE STATE ex rel. WATTS ENGINEERING COM-
    PANY, Appellant, v. PUBLIC SERVICE COM-
    MISSION.

In Banc, January 17, 1917.

1. **PUBLIC SERVICE COMMISSION**: Administrative Board. The Public Service Commission is an administrative board created by law, as an arbiter between the public and public service corporations, and as such has been given extensive powers, with the limitation, however, that all its acts are subject to court review. Such corporations should not be permitted to fix an arbitrary and unreasonable rate for product or service.

2. ————: **Test Order: Unreasonable Rates.** Where the evidence tends to show an exorbitant rate for gas, that the company has capacity for increased production, and it cannot be said what increase of consumption might follow a reduced rate, a test order made by the Public Service Commission, by which the rates are materially reduced, and wherein provision is made for monthly reports and for a modification after an actual test of the rates fixed, will not be declared unreasonable. There is no better way to determine what effect lower rates will have on a public service than by an actual test.

*Held*, by WOODSON, J., dissenting, with whom BOND, J., concurs, that the law does not permit the commission to take for a public use the property of a public service corporation, for any time however short, without just compensation; and where the commission has found from the evidence that at the existing and prior rates the company is earning only about one-half of what is a reasonable remuneration on the capital invested, a temporary or test order reducing those rates by more than twenty per cent is confiscatory and unreasonable, and cannot be justified by testimony showing that 'lower rates will increase consumption, but to what extent is not shown or found.

3. ——: **Rates in Other Cities.** The fact that other cities of similar population are obtaining gas at a much less rate than that charged by relator is some evidence of the fact that its rate is unreasonable. *Held*, by WOODSON, J., dissenting, with whom BOND, J., concurs, that the reasonableness of the rates charged by a public service corporation cannot be determined by a comparison with rates charged elsewhere, unless it is made to appear that all the conditions under which the service is rendered are the same and that the rates are remunerative.

Appeal from Cole Circuit Court.—*Hon. J. G. Slate,* Judge.

AFFIRMED.

*J. L. Hornsby* for appellant.

(1) Neither the Legislature nor a commission with power to regulate and fix rates, can fix rates so low as to deprive a public utility corporation of a reasonable return on the amount of its investment used in the public service. Upon the conception of the right to take tolls as a species of property belonging to a public utility corporation rest all decisions of all courts, both State and Federal, denying the right of legislature or commissions to restrict such tolls below a reasonable a- mount. In fixing rates experimentation with the prop- erty of anyone is never justifiable. Speculations as to the future are not guides for judicial action. Railroad v. Dey, 35 Fed. 881; Smyth v. Ames, 169 U. S. 466; Rail- road v. Railroad Comm., 155 Fed. 792; Buel v. Railroad, 1 Wis. R. C. R. 324; Milwaukee El. R. & L. Co. v. Mil- waukee, 87 Fed. 577; In re Rochester (N. Y. P. S. C. 2d Dist.), Pub. Utilities, Rep. Ann. 1915-A, p. 1095; Tel. & Tel. Co. v. Louisville, 187 Fed. 637; Coal & Coke Ry. Co. v. Conley, 67 W. Va. 129. (2) The reasonableness of rates charged by a public utility corporation cannot be determined by comparison with rates charged elsewhere, unless it is made to appear that all the conditions and circumstances under which the service is rendered are the same, and that the rates elsewhere are remunerative. Railroad v. Dey, 35 Fed. 866; Ames v. Railroad, 64 Fed.

188, cited with approval in Smyth v. Ames, 169 U. S. 528; Arkansas Rate Cases, 187 Fed. 303.

*Wm. G. Busby* and *Alex. Z. Patterson* for respondent.

(1) The right of a corporation to earn a fair return upon its investment is qualified by the proviso that in no event shall the company be permitted to charge the consumer more that the service is reasonably worth. Road. Co. v. Sandford, 164 U. S. 597; Water Works v. San Francisco, 192 Fed. 137; Water Co. v. San Francisco, 165 Fed. 679; Water District v. Water Co., 99 Me. 371; Brymer v. Water Co., 176 Pa. 231; Smyth v. Ames, 169 U. S. 545; Land Co. v. National City, 174 U. S. 757; Cotting v. Stock Yards Co., 183 U. S. 91; Public Service Co. v. Public Utility Board, 84 N. J. L. 474; Long Branch Comm. v. Water Co., 70 N. J. Eq. 84, 71 N. J. Eq. 790; Pond on Public Utilities, secs. 444, 543. (2) In fixing just and reasonable rates, it is proper to consider the probability that increased consumption at the lower rate may result in increased earnings. Wilcox v. Gas Co., 212 U. S. 50, 48 L. R. A. (N. S.) 1134; Wyman on Public Service Corporations, sec. 1129. (3) In determining just and reasonable rates for service of a public utility, comparison with rates customarily charged in localities similarly situated is a proper test. Gas Co. v. Public Utility Board, 84 N. J. L. 463; Traction Co. v. Chicago, 199 Ill. 645; Cotting v. Stock Yards Co., 183 U. S. 79; Railroad v. Wilson, 119 Ind. 358; Johnson v. Railroad, 16 Fla. 623; Gunning, on Law of Tolls, p. 61; Angell on Carriers, sec. 392. (4) The utility corporation assumes the risk of its investment and no return whatever is guaranteed to it. Telephone Co. v. Carthage, 235 Mo. 644; Water District v. Water Co., 99 Me. 371; Smith v. Ames, 169 U. S. 466; Pond on Public Utilities, sec. 454; Water Works v. San Francisco, 192 Fed. 137.

GRAVES, C. J.—This proceeding was instituted by the city of Columbia, by filing a complaint with the Public Service Commission against the Watts Engineering Company, a manufacturer, distributor and seller of

gas in said city. The complaint charged that the company's rates charged for gas to consumers were "excessive, exorbitant and unreasonable," and asked that the same be reduced "to such amount as the commission shall deem reasonable and just."

In due time the company filed its answer denying the allegations of the complaint. Thereafter, at the time the cause was set for hearing, each party introduced evidence before the commission.

The evidence introduced by the complainant was to the following effect:

That the rates charged by other gas companies in the cities of this State, as compared with the rates complained of, were lower. These rates were ascertained by a study of the schedules of rates of gas utilities of this State, required by law to be filed in the office of the commission. The cities considered in this statement are Boonville, Brookfield, Cape Girardeau, Chillicothe, Clinton, Columbia, Excelsior Springs, Hannibal, Independence, Jefferson City, Kirksville, Lexington, Louisiana, Marshall, Mexico, Moberly, Oak Grove, Rich Hill, Springfield, Sedalia, St. Charles, St. Joseph, St. Louis and Kansas City.

Witness Sheppard, a city councilman of Columbia, testified that the rate for gas in Columbia was higher than similar rates in all of these twenty-four cities, with the exception of Oak Grove, which had only a total population of 641, and in which a more expensive kind of gas was manufactured. That only one city (Cape Girardeau) of the twenty-four had as high a minimum charge per month for gas as Columbia.

The appellant objected to a comparison of the rates of some of the cities with the rates in Columbia for the reason that in said cities the same company owned both the gas and electric plants, whereas in Columbia the electric plant was owned by the municipality. This objection was overruled, and exceptions duly saved. The commission ascertained the rates in existence in the cities of Brookfield, Kirksville, St. Charles, Hannibal, and Inde-

pendence, in all of which the gas utilities were operated independently of the electric utilities.

The results of its findings of these rates and comparison with those of appellant at Columbia are shown by the following table:

Comparative rates of utilities, furnishing gas service only, operating in Missouri in cities of size comparable with Columbia.

| City | Population | Cost per 1,000 cubic feet up to 10,000 cubic feet | | | Cost per 1,000 cubic feet over 10,000 cubic feet. | | |
|---|---|---|---|---|---|---|---|
| | | Gross | Dis-count | Net | Gross | Dis-count | Net |
| Columbia...... | 9,662 | 2.00 | .25 | 1.75 | 2.00 | .40 | 1.60 |
| Brookfield.... | 5,749 | 1.35 | .10 | 1.25 | 1.25 | .10 | 1.15 |
| Kirksville...... | 6,347 | 1.35 | .10 | 1.25 | 1.35 | .10 | 1.25 |
| St. Charles.... | 9,437 | 1.10 | .10 | 1.00 | 1.10 | .10 | 1.00 |
| Hannibal...... | 18,341 | 1.50 | .50 | 1.00 | 1.50 | .70 | .80 |
| Independ-ence............ | 9,859 | 1.25 | .10 | 1.15 | 1.25 | .10 | 1.15 |
| Average in-cluding Columbia.. | | 1.31 | | 1.13 | 1.29 | | 1.07 |

It further appeared from the evidence that the cost of coal at Columbia was less that the average market price in the State, because of competing railroads; that the character of the ground at Columbia was not such as to make the construction of the plant more expensive than other cities, since the mains could be laid without cutting through rock, as was the case at Hannibal. That Columbia was a city of much wealth, with several schools and colleges, including the State University; that the E. W. Stephens Publishing Company and other industries were there located.

The evidence showed that the University and the E. W. Stephens Publishing Company were permanent customers of appellant, and together consumed fully one-fourth of appellant's product; that the demand by the University was increasing rapidly.

That the company has in its plant at Columbia three separate equipments for the manufacture of gas:

First: A water gas equipment in duplicate of ample size to supply the present requirements and an increase

269 Mo.—34

to approximately double these requirements. This equipment is the only part of appellant's gas producing plant in use at this time.

Second: A coal gas equipment of vertical coal gas retorts of such size as to easily care for the present requirements. This equipment has not been used by appellant for a number of years.

Third: A still older coal gas equipment, capable of caring for the present requirements, but too small to be relied on. This equipment is likewise not in use.

Mr. Babb, witness for complainant, testified that he delayed putting gas into his house for two years on account of the high rates and the high minimum charge of one dollar per month. He also testified that in his opinion the lowering of the rate and the minimum charge per month would materially increase the number of consumers.

J. A. Stewart, witness for complainant, testified that there would unquestionably be a much greater number of customers if the gas rate was lowered. This witness further testified that the appellant company would not supply gas to a new addition in Columbia, and witness was compelled to lay his own mains in this addition, though there were from forty to sixty consumers in the addition, and prospects of a greater number. That after witness put in his own mains, appellant furnished gas to consumers at its regular rates, to-wit, a new rate of $1.75 to consumers using less than 10,000 cubic feet.

Witness W. J. Sheppard, for complainant, testified that the reduction of rates at Columbia would, in his opinion, materially increase the business of appellant. That the total value of the appellant's property, tangible and intangible, used in the service of the public in the production, manufacture and sale of gas at Columbia, was $77,000.

In determining this value, the commission excluded the value of the coal gas equipment, since it appeared that it was not in use, and had not been used since the water gas equipment was installed, and since it appeared that the water gas equipment was more than ample for the pres-

ent requirements, and all probable future requirements of Columbia.

A net return of 7.5 per cent. on appellant's investment was found by the commission to be fair and reasonable.

An allowance of three per cent as a reasonable allowance for. surplus and contingencies was made, as is required by law. The average annual operating expense of appellant's plant for the last five years was found to be $15,803.

The evidence for the defendant showed in substance the following facts:

The defendant offered evidence showing the value of the property of the Columbia Gas Works: also, the annual receipts and operating expenses of the business for the last five years. It also appeared from defendant's testimony that it owned about twelve miles of gas mains, and that, in addition, there were about three miles of mains laid by private enterprise to serve an outlying residence district recently developed for the purpose of real estate speculation, and that defendant furnished gas through these also, making a total of fifteen miles of mains in Columbia.

It further appeared that defendant had made special efforts several times in the last few years to develop and increase the consumption of gas. It also appeared that defendant was operating in competition, so far as the lighting business was concerned, with a municipal electric light plant belonging to complainant. It further appeared that defendant sells approximately eleven million cubic feet of gas per annum, of which about one-fourth is sold to two consumers, the State University and the E. W. Stephens Publishing Company; that the rates charged for gas by defendant are $1.75 net per one thousand cubic feet per month, and $1.60 net per thousand cubic feet to those using over ten thousand cubic feet per month; that the State University and the E. W. Stephens Publishing Company were the only consumers which need sufficient gas to obtain the rate of $1.60 per thousand cubic feet.

It further appeared from the testimony of Mr. W. H. Judge, who became manager of the gas plant of defend-

ant in 1893, that when he took charge the rate for gas was $2.70 net per thousand cubic feet; that some time after he took charge, he reduced the rate for fuel gas to $1.50 per thousand cubic feet, but the rate for gas for illuminating purposes remained at $2.70 net per thousand cubic feet until 1907. It appeared from the testimony that in 1907, the rates for gas were changed from $2.70 for illuminating purposes and $1.50 for fuel, to the present rates, $1.75 net to consumers using less than ten thousand cubic feet per month and $1.60 for consumers using more than ten thousand cubic feet per month. That the reduction in the price of fuel gas from $2.70 to $1.50, made about 1895, resulted in a substantial increase in the number of consumers of gas for fuel purposes, but that the reduction made in 1907, from $2.70 to $1.75 per thousand cubic feet, did not result in any substantial increase, either in the number of consumers or in the amount of gas sold.

After complainant and defendant had introduced their evidence in the case, the commission had its engineer make an inventory and appraisal of the property of the company, and upon this appraisal the commission has fixed the value of the property of defendant used in the service of the public at $77,000. The defendant's coal-gas plants were worth an additional sum of $10,124, which was by the commission disallowed in fixing its rates. The testimony showed that the plant is in first-class condition, the quality of gas produced very good, and the service generally satisfactory.

The commission, in deciding this case, found, as stated above, that the value of the property of the Columbia Gas Works upon which relator is entitled to earn a return is $77,000; that relator is entitled to three per cent of the value of the property for surplus and contingencies each year (depreciation fund) and that relator is entitled to a net return on its investment of not less than 7.5 per cent, making thus a total return which relator is entitled to earn of 10.5 per cent on a valuation of $77,000, or $8,085.

It further appeared that the entire force employed in the operation of the gas works consisted of only six persons, including the president; that the president received a salary of $1,000 per annum; the general manager, who was also book-keeper, collector, and entire office force, received a salary of $2,000 per annum, and that the other four persons on the pay-roll constituted the mechanical and laboring force of the plant.

It further showed that for some time past, by reason of the exorbitantly high rates charged for insurance, the company had carried its own insurance risk; that the cost of insurance, if paid to an insurance company, would be $431 per annum; that the average receipts of the company for the past five years had been $21,385.83 per annum, and that the average operating expense for the last five years has been $16,803 per annum, making the annual average net income for the past five years $4,583.83.

The commission found from the evidence before it that the rates charged by appellant for gas were $1.75 net per 1,000 cubic feet for consumers using less than 10,000 cubic feet, and $1.60 net per 1000 cubic feet for consumers using more than 10,000 cubic feet. (The meaning of the terms "net gas rate," as used in this connection, is the rate after deduction of amount allowed for prompt payment from the gross rate.) Appellant made a minimum charge of one dollar per month to all consumers using 600 cubic feet or less.

By the order of the commission, entered after a consideration of the evidence before it, appellant's rates were fixed as follows:

For the first 10,000 cubic feet per month, a net rate of $1.35 per 1000 cubic feet. For all in excess of 10,000 cubic feet per month, a net rate of $1.25 per 1000 cubic feet, with a minimum monthly charge of seventy-five cents.

After the decision and order of the commission made in this case on February 3, 1915, the defendant therein filed its motion for rehearing, which, in due course, was overruled. Thereupon the defendant therein, relator

herein, applied to the circuit court of Cole County for a writ of review, assigning numerous reasons therefor. The trial in the circuit court resulted in a finding and judgment against the company, and an affirmance of the order of the commission. From that judgment the company appealed to this court.

It is important, however, that the order of the commission be set out. As to the rates fixed, the foregoing sufficiently outlines the order, but the important part of the order (so far as a determination of this controversy is concerned) reads:

"Order 6. That defendant, Watts Engineering Company, keep true and correct records of its total gross income and total gross operating expenses, from month to month, and file a monthly sheet with the commission, duly verified by its secretary and treasurer, setting forth fully such income and operating expenses, said reports to begin April 1, 1915, and continue until otherwise ordered by the commission.

"Order 7. That the commission hereby retains jurisdiction of this case and reserves the right to modify the above named rates at any time on its own motion; and that complainant or defendant shall be at liberty at any time after an actual test of the rates fixed herein has been made to apply to the commission by motion or supplemental petition, upon such proof as either may desire, and upon reasonable notice to said complainant or defendant, for a modification or revision of the rates herein prescribed, if found to be unreasonable or unjust to the public or said defendant, or shall fail to provide a fair and just return on the fair present value of defendant's property as fixed herein.

"Order 8. That this order shall take effect on February 25, 1915, and that the secretary of the commission shall forthwith serve on each of the parties hereto a certified copy of this order and of the opinion filed herewith."

This outlines the case.

I.  If the order made in this case had been one permanent in character the question presented would be entirely different.  But such is not the nature of the order made by the Public Service Commission.  Our function is to determine the reasonableness of the order, as we find it.  The present order is one made for the purpose of making a test, to the end that the real question of a reasonable rate may be ultimately determined.  The Public Service Commission is an administrative board, created by the lawmakers, as an arbiter between the general public and the public service corporations, and to this end has been given extensive powers  (Laws 1913, p. 602 et seq.), with all its acts subject to court review, however.  The fixing of rates is a delicate and vital subject, when both the public interest and the interest of the public service corporations are considered.  These corporations should not be crushed by the fixing of inadequate rates, nor should the public be imposed upon by arbitrary business methods adopted by such corporations, which would increase rates.  To be more pointed, such corporation should not be permitted to fix an exorbitant rate for their product or service, and then tie the hands of the Public Service Commission, by showing that at those rates their business is unprofitable. A large per cent of profit on limited sale, will often not yield, in the aggregate, as much actual profit, as a small per cent of profit on larger sales.  The price of a product may be made so high as to preclude its general use. These are all vital questions for determination by the Public Service Commission.

*Test Order.*

In the instant case the evidence tends to show an exorbitant rate for gas at Columbia.  It further tends to show that a reduction in rates would increase the sales or consumption.  Grant it, that there is evidence contra.  No one knows just what increase of consumption might follow a reduced rate.  This can only be determined by actual test.  Such was the course pursued by the Public Service Commission by the order made in this case, and it is this "test" order that we are called upon to declare unreasonable.  To say that the Public

Service Commission cannot, under the showing made in this case, make an order putting in a test rate as in this case, would be to sap the very vitals of the Public Service Act.

In discussing a fixed rate (as contra-distinguished from a mere test rate) the U. S. Supreme Court in Willcox v. Consolidated Gas. Co., 212 U. S. 1. c. 50 and 51, said:

"But there may be other cases where the evidence as to the probable result of the rates in controversy would show that they were so nearly adequate that nothing but a practical test could satisfy the doubt as to their sufficiency.

"In this case a slight reduction in the estimated value of the real estate, plants and mains, as given by the witnesses for complainant, would give a six per-cent return upon the total value of the property as above stated. And again, increased consumption at the lower rate might result in increased earnings, as the cost of furnishing the gas furnished.

"The elevated railroads in New York when first built charged ten cents for each passenger, but when the rate was reduced to five cents it is common knowledge that their receipts were not cut in two, but that from increased patronage the earnings increased from year to year, and soon surpassed the highest sum ever received upon the ten-cent rate."

There is really no better way to determine just what effect lower rates will have on a public service business, than by an actual test.

Again along the same line, the United States Supreme Court in Louisville v. Tel. & Tel. Co., 225 U. S. 430, used this language: "But when it is remembered what clear evidence the court requires before it declares legislation otherwise valid void on this ground, and when it is considered how speculative every figure is that we have set down with delusive exactness, we are of opinion, that the result is too near the dividing line not to make actual experiment necessary."

The interests of the public service corporation are not the only interests to be conserved by the orders of the Public Service Commission.

In Turn Pike Co. v. Sandford, 164 U..S. 1. c. 596, it was said:

"It cannot be said that a corporation is entitled, as of right, and without reference to the interests of the public, to realize a given per cent. upon its capital stock. When the question arises whether the Legislature has exceeded its constitutional power in prescribing rates to be charged by a corporation controlling a public highway, stock-holders are not the only persons whose rights or interests are to be considered. The rights of the public are not to be ignored. It is alleged here that the rates prescribed are unreasonable and unjust to the company and its stockholders. But that involves an inquiry as to what is reasonable and just for the public. If the establishing of new lines of transportation should cause a diminution in the number of those who need to use a turnpike road, and, consequently, a diminution in the tolls collected, that is not, in itself, a sufficient reason why the corporation, operating the road, should be allowed to maintain rates that would be unjust to those who must or do use its property. The public cannot properly be subjected to unreasonable rates in order simply that stockholders may earn dividends. The Legislature has the authority, in every case, where its power has not been restrained by contract, to proceed upon the ground that the public may not rightfully be required to submit to unreasonable exactions for the use of a public highway established and maintained under legislative authority. If a corporation cannot maintain such a highway and earn dividends for stockholders, it is a misfortune for it and them which the Constitution does not require to be remedied by imposing unjust burdens upon the public. So that the right of the public to use the defendant's turnpike upon payment of such tolls as in view of the nature and value of the service rendered by the company are reasonable, is an element in the general inquiry whether the rates established by law are

unjust and unreasonable. That inquiry also involves other considerations, such, for instance, as the reasonable cost of maintaining the road in good condition for public use, and the amount that may have been really and necessarily invested in the enterprise. In short, each case must depend upon its special facts; and when a court, without assuming itself to prescribe rates, is required to determine whether the rates prescribed by the Legislature for a corporation controlling a public highway are, as an entirety, so unjust as to destroy the value 'of its property for all the purposes for which it was acquired, its duty is to take into consideration the interests both of the public and of the owner of the property, together with all other circumstances that are fairly to be considered in determining whether the Legislature has, under the guise of regulating rates, exceeded its constitutional authority, and practically deprived the owner of property without due process of law.''

The order made in the instant case has in view the working out of the rate question at Columbia along those lines hereinabove suggested. The order and findings show the value of the investment, and the expense of operation. It shows that the plant has capacity for increased production, if increased consumption could be procured. The facts tend to show that increased consumption would most probably follow a reduction of rates. Under these circumstances we do not think that the order involved here is an unreasonable one.

II. The fact that other cities of a similar population were procuring gas at a much less rate is some evidence of the fact that the rates in Columbia were unreasonable. We think the doctrine well announced in Public Service Comm. v. Public Utility Board, 84 N. J. L. 1. c. 474-5, thus: ''In determining the justice and reasonableness of rates, perhaps no better test can ordinarily be found than the rates customarily charged in localities similarly situated, although we do not say that even that test is infallible. A table printed in one of the briefs shows that while in

*Rates in Similar Cities.*

some municipalities with a population no larger than that of the Passaic district the charge is less than ninety cents, in others it is as high or higher. Upon the whole we find no reason in the rates charged elsewhere to believe that ninety cents is too high for a community with the population of the Passaic district. Nor do we find the charge too low when compared with other municipalities. As a business question, the price seems within the bounds of a fair chance.''

The proof in that case took very much the lines in this case. The evidence there showed the rates for gas given to other communities, and the populations thereof. The showing made in the instant case in this respect was amply sufficient to support the character of the order here made. The order was not an unreasonable one on the showing made, and the judgment of the circuit court, which sustained the order, should be and is affirmed. If after the test, the rate is found to be too low, the matter can be corrected by the Public Service Commission. *Faris, Blair* and *Revelle, JJ.,* concur; *Woodson, J.,* dissents in opinion filed; *Bond,* and *Walker, JJ.,* dissent.

WOODSON, J. (dissenting)—There are but two legal propositions here presented for determination; and the first is stated by counsel for the company in this language:

''The reasonableness of the rates charged by a public utility corporation cannot be determined by a comparison with rates charged elsewhere, unless it is made to appear that all the conditions and circumstances under which the service is rendered are the same, and that the rates are remunerative.''

There is no pretense that the facts and circumstances under which the appellant manufactured and distributed gas were the same as those under which the companies in the other cities mentioned manufacture and distribute the same product. For that reason counsel for appellant insist that the comparison of rates mentioned, made by the commission, was erroneous.

There can be no doubt but what that ruling of the commission, as well as that of the circuit court, was improper. We know from observation and common knowledge that the cost of producing an article greatly varies, according to the facts and circumstances surrounding the parties making the production.

While the complainant introduces evidence tending to show that coal was cheaper at Columbia than in some other parts of the State, and that the cost and expense of laying gas pipe in that city was less expensive than it was in the city of Hannibal, yet they by no means cover all the facts and circumstances involved in the manufacture and distribution of gas. They constitute but a small percentage of the facts, and their cost by no means constitutes the bulk of the cost of such production, or, at least, in the absence of all evidence on that subject, neither the commission nor the court has any authority to so presume. All such facts and circumstances must be established by evidence before such a comparison can be legally made as a basis for or element in an order reducing the prices to be charged for the gas furnished to the consumer.

Moreover, should it be conceded that the cost of production by all of said companies was the same, yet that showing of itself would not warrant a reduction of appellant's rates, unless the evidence should further show that the rates charged by said other companies produced a reasonable remuneration for the capital invested by them. This is true, for the reason that gas companies, like many other corporations, do not earn a sufficient sum to pay expenses of operation, much less to pay a reasonable percentage on the investment.

The following authorities so hold: C. & N. W. Ry. Co. v. Dey, 35 Fed. 866; Ames v. Union Pac. Ry. Co., 64 Fed. l. c. 188; Smyth v. Ames, 169 U. S. l. c. 528; In re Arkansas Rate Cases, St. Louis Southwestern Ry. Co. v. Allen, 187 Fed. 290.

II.  Appellant's second contention is that the schedule of rates to be charged by relator, as fixed by the order of the Public Service Commission, is unreason- Confiscatory able, unjust, confiscatory, and, consequently, Rates. deprives relator of his property without just compensation.

In order to fully understand this contention as applied to this case, it becomes necessary for us to briefly state the evidence bearing on this point.

The evidence tended to show and the commission found that the value of the property of the company was $77,000.  This valuation does not include the value of $10,124 of the coal gas plants the company owns, but not in' use in the production of gas, but as counsel does not insist upon having that value added to that fixed by the commission, we will pass it by.

The commission found that the company was entitled annually to three per cent. of the value of the property for depreciation, repairs, the upkeep of the plant, etc., and 7.5 per cent. interest on the investment, equaling a total of 10.5 per cent.

The average annual gross receipts of the company for the last six years were $21,386.83, and the average annual operating expenses during the last five years were $16,803.  The net annual receipts of the company during that period were $4,583.83, or less than six per cent. on the money invested—$77,000.

Deducting the three per cent. for depreciation, etc., from the net income, $4,583.83, leaves a net annual income on the investment of only $2,273.83, or less than three per cent per annum, being only forty per cent of the income the company was entitled to as fixed by the commission, 7.5 per cent.  In other words, the commission declared that the company was entitled to an annual net income of $8,085, and it found that the company is now earning at its old rates only $4,593.83 net.

It therefore follows from the commission's own findings that the company is entitled to earn 76 per cent more than its present net income.

Notwithstanding those figures, the commission ordered a reduction of the rates of the company now charged for gas, from $1.75 net to consumers using less than 10,000 cubic feet per month, to $1.35 net, and from $1.60 net to consumers using over 10,000 cubic feet per month, to $1.26 net, equaling a reduction of its present aggregate rates to a fraction more that 20 per cent, and if we deduct this 20 per cent, $454.76, from the present annual net income on the investment of the company, $2,273.83, then its net annual income on investment will be only $1,819.07. And the only reason assigned or shown by the evidence for said reduction of rates, is the testimony of the following witnesses, which is as follows:

Mr. Babb, witness for complainant testified that he delayed putting gas into his house for two years on account of the high rates, and the high minimum charge of one dollar per month. He also testified that in his opinion the lowering of the rates and the minimum charge per month, would materially increase the number of consumers.

Col. Stewart, a witness for complainant, testified that there would unquestionably be a much greater number of consumers if the gas rates were reduced.

W. J. Sheppard, witness for complainant, testified that the reduction of rates at Columbia would, in his opinion, materially increase the business of the company.

To say nothing of the evidence introduced by the company tending to show a reduction in the rates to be charged for gas would not increase its net income, yet it was upon the foregoing vague and speculative testimony of those witnesses that the commission found that the reduction of the rates mentioned would increase the business of the company, but how much no witness stated, nor did the commission attempt to ascertain or fix the percentage of increase of the earnings of the company would be, if any, caused by said reduction of rates. However, by implication it must have been sufficient to not only overcome the large difference between the sum the company was entitled to receive on its investment and the sum it was actually receiving under the old

rates, but also to so increase the volume of its business so as to enable it to pay the three per cent net for depreciation, etc., and the 7.5 per cent on its investment, equaling 10.5 per cent net, amounting as before shown, to the sum of $8,065, as against its present net income of $4,583.83, which would practically double its annual net income.

In order to accomplish this result, the company would have to practically double the volume of its business, with but a small proportional percentage of increase in the cost of production—the exact amount and percentage of each, I have not figured.

In the case of the Chicago, Burlington & Quincy Ry. Co. v. Public Service Commission, 266 Mo. 333, it was held that such vague and speculative evidence, as that before mentioned, was insufficient to support a similar order of the commission. But independent of any authority upon that subject, it seems to me that common sense would dictate a contrary conclusion to be drawn therefrom, especially in the light of the facts that Columbia has a population of only 9,662, having only one manufacturing plant of any importance, the greatest consumer of gas, and was operating its own independent electrical plant, thereby greatly lessening the demand for illuminating gas.

Under this state of facts we fully concur with the contention of counsel for the company that the rates fixed by the commission are unreasonable, unjust and confiscatory, and, if enforced, would under the State and Federal constitutions deprive it of its property without just compensation; so hold the following cases, cited by counsel, all of which, and many others, we had occasion to examine and consider in the case of White v. Delano et al., Receivers of Wabash Ry. Co., 270 Mo. 16; Chicago & N. W. Ry. Co. v. Dey, 35 Fed. 866, 881; Smyth v. Ames, 169 U. S. 466; Seaboard Air Line Ry. v. Alabama R. R. Comm., 155 Fed. 792; Buell v. C., M. & St. P. Ry. Co., 1 Wis. R. R. Comm. Rep. 324; Milwaukee El. Ry. & Light Co. v. Milwaukee, 87 Fed. 577; In re Rochester, (N. Y. P. S. C. 2 District) Pub. Utilities Rep. Ann.

1915-A, p. 1095; Cumberland Tel. & Tel. Co. v. Louisville, 187 Fed. 637; Coal & Coke Ry. Co. v. Conley, 67 W. Va. 129.

Counsel for the commission present the four following legal propositions for decision, viz:

"1. The right of a corporation to earn a fair return upon its investment is qualified by the proviso that in no event shall the company be permitted to charge the consumer more than the service is reasonably worth.

"2. In fixing just and reasonable rates, it is proper to consider the probability that increased consumption at the lower rate may result in increased earnings.

"3. In determining just and reasonable rates for service of a public utility, comparison with rates customarily charged in localities similarly situated is a proper test.

"4. The utility corporation assumes the risk of its investment and no return whatever is guaranteed to it."

That those statements are correct, abstract legal propositions, as shown by the many authorities cited in support thereof, no one will question; but the facts of this case are such, as disclosed by this record, they do not warrant their application to it.

The majority opinion seems to proceed upon the theory that because the order of the commission fixing the unjust and confiscatory rates mentioned is temporary in character, and not permanent, therefore it should be upheld.

In reply to that I wish to state that I know of no law. or morals which authorizes the commission to take the property of this company for public use for any period of time, however long or short, without just compensation. That such has been done in this case there is no question, which clearly violates both the State and Federal Constitutions. [State v. Canning Co., 157 N. W. (Minn.) 777.]

There is a class of cases which hold, and properly so, that where, upon the face of the entire record, it appears in all probability that a public service corporation is charging and collecting exorbitant and unreasonable

rates for the service performed, the commission may make a temporary order lowering the rates to such figures as it believes to be reasonable, and require the company to keep an accurate account of its receipts and expenditures during the existence of said order, and determine therefrom whether in fact said rates are reasonable or not; and if by that means they are found to be reasonable, then the rates may be restored or raised to a figure that will yield a reasonable remuneration upon the capital invested in the business. [State ex rel. Missouri Pacific Ry. Co. v. Public Service Commission, *post*, p. 634.] But that is not this case—here the commission has found from the evidence that at the old rate the company is not earning but about one-half of what is a reasonable remuneration on the capital invested. And in the class of cases mentioned, the order generally permits the company to collect and retain the proceeds of the old rates until it can be ascertained whether or not the new rates are reasonable; if found to be reasonable, then the company must refund to its patrons the difference between the old and the new rates; but if found to be unreasonably low, under this order, then the company cannot recuperate its loss, and, consequently, to that extent its property has been confiscated. So hold the authorities before cited. I therefore dissent.

*Bond, J.,* concurs.